22-30808 Container Shp v. MSC Mediterranean Good morning. May it please the Court. My name is John Werner. I'm with the law firm of Lions and Flood, and I represent the appellants, MSC in this case. This case is primarily about how a court should properly analyze whether specific personal jurisdiction exists in the context of an action brought under the New York Convention and the Federal Arbitration Act to enforce an arbitration award. There's not a lot of case law on this issue, and the reason it's a thorny problem is because Supreme Court decisions, a series of them, starting from Kokkonen, leading to Vaden, and then most recently Badgero, strongly suggest that once an arbitral award has been issued, the underlying substantive cause of action that led to the award no longer exists. There's a distinction between the enforcement action, the claim brought by Conti in this case to enforce the award, and the underlying breach of contract, which gave rise to the arbitration proceeding. And so there's this inherent problem. Well, explain to me what is – I mean, the underlying assumption here is that you've got a final arbitration award, and what is all this about the English Court of Appeal having accepted a hearing about the award? I'm happy to explain, Your Honor. And in fact, there's some new developments that just recently happened in the UK proceedings on Friday. So the backdrop is that Conti and MSC were engaged in arbitration in London for a number of years over this incident, and Conti was successful in its arbitration. A number of awards were issued against MSC, but MSC filed a proceeding in the High Court of Justice in order to invoke a limitation of liability regime under the LOMC, and they lost at the trial level. They then sought leave to appeal from the UK Court of Appeals, which was granted. A hearing was held on July 11th and 12th, and just this past Friday, a judgment was handed down by the UK Court of Appeals denying MSC the right to limit liability. Now, MSC is still considering its options, but it is strongly considering seeking leave to further appeal from the UK Supreme Court. It's an issue of significance not only in this particular dispute but other disputes, other ship fire cases, where there's an issue about whether the charter of the vessel has the right to limit liability with respect to claims brought by the owner of the vessel. I understand that the time to file for leave to appeal is in late September. Now, the reason that Conti came here to enforce its award rather than try to enforce it in London is essentially to avoid, to try to circumvent the potential impact of the UK litigation. They did not want their recovery to be limited under UK law, and so they instead sought to bypass that limitation proceeding, and I would argue essentially forum shopped by MSC. Well, I don't quite understand. Do you mean they could get more than $220 million? No. No, Your Honor. I'm happy to clarify. The award was in the amount that it was in, but if the UK limitation proceeding had went in MSC's favor, then MSC would no longer be required to pay the full amount of the award to Conti. There'd be a reduction, I think, of about half of the amount. So Conti at the moment is winning in both fora. It looks that way, Your Honor. Okay. And the next question I have is, why the hell—so they forum shopped to New Orleans, and suppose this court confirms the award, how would Conti go about enforcing it or enforcing the judgment? Would they go around—they own the boats, right? I mean— Well, it's up to Conti to decide how to execute on the judgment. There's all that normal means. Execute is what I mean, yeah. I should note that approximately—there's a further payment that's going to be made by MSC's underwriters on September 7th, and when that further payment is made, the total amount that has been paid on the awards will be approximately $110 million, which includes interest, awarded by the London Arbitral Tribunal, and that would leave, by my reckoning, roughly about $120 million left unpaid. There is another ring to the circus, which is the New York proceedings, which I am involved in directly. And the Second Circuit recently handed down a decision affirming the district court's liability findings, and since that time, counsel for Stoltz has made representations in court in New York that they may or are, in fact, considering arranging for payments of the balance owed to Conti under the arbitral awards. On the basis that they are required to indemnify MSC for any liabilities that it incurs, including with respect to Conti and the London award. So that in a matter of months, many of the issues present in this appeal could be moot, but of course, until they pay, and until MSC pays, I think the issue is still alive. So maybe we ought to just sit on it, huh? I leave that to Your Honor's discretion. Personally, I find the issue to be interesting. It's very interesting. Sometimes it's best to stay out of interesting disputes, though. On the personal jurisdiction point, what is your best circuit case, not Badgeroe, not Vaden, which are both subject matter jurisdiction cases, your best circuit case for the proposition that in an enforcement action, you cannot look through to the underlying dispute with respect to personal jurisdiction? Well, the look-through issue— In other words, I can't consider any of the contacts in the underlying controversy that led to the arbitration award. I can't look at that with respect to personal jurisdiction. Well, if Your Honor is referring specifically to the look-through doctrine as described in Vaden and Badgeroe, then I would say my best case is the Fifth Circuit's decision. I believe it's ATL. It's a 2021 decision. It's not in the briefs because I didn't think it was really on point. What that decision said was that the district court erred in looking through to the underlying dispute, pretending the arbitration award didn't exist, for the purposes of determining whether the amount in dispute was sufficient to meet the requirements for subject matter jurisdiction. It was a diversity case. Well, that's subject matter jurisdiction. That's right, Your Honor. Yes, I understand it's constitutional due process, et cetera, et cetera. But it's different. Right. I'm not, Your Honor, relying on Vaden or Badgeroe for the subject matter jurisdiction piece of it. It's more the underlying principle. Why did the Supreme Court feel compelled to reach the results it did in Vaden and Badgeroe? It's because it thought, I think correctly, that there's this distinction that once an arbitration award has been issued, the underlying dispute is resolved. I thought it was the language of the FAA was different in the two cases with respect to save for the arbitration clause. They were making a textual distinction between two sections of the FAA, I thought. Well, Your Honor is correct. That's a piece of it. In Vaden, what happened was the court found that Section 4 of Chapter 1 of the FAA had that save for the arbitration agreement language in it. And therefore, on a motion to compel arbitration, the court felt that you couldn't, you know, look to the arbitration. You were entitled to look through the arbitration agreement to the underlying disputes in order to find subject matter jurisdiction. And then Badgeroe arose because a number of circuits, including the Fifth Circuit, had extended that logic in the context of motions to enforce or modify or vacate arbitral awards. And the Supreme Court said, no, that's not correct. We only granted that limited look-through power based on that specific language being present. This is apples and oranges. Pardon me. If one of these parties was U.S.-based or had U.S. contacts in regard to the arbitration, we wouldn't be here, right? We're only here because you've got two non-domestic companies both jockeying for a position in an international market. That's absolutely correct, Your Honor. And I want to point out one more thing. Well, that's true. That's certainly true. The curious thing here is, though, there is a contact in New Orleans that doesn't directly relate to what happened in the underlying case. In other words, the contact has to do with the container containing the chemical, right? Doesn't that change? I mean, that's the thing. If it was purely just, well, the parties have nothing to do with it and we're just here purely in form shopping, yeah, but the container was here. I want to address that, but I want to make one remark very quickly first, which is if you look at all the Supreme Court decisions addressing specific jurisdiction, not once has the Supreme Court ever found specific jurisdiction where the plaintiff was foreign, was not connected to that forum. And so there's a strong presumption against forum shopping, which is what I think has happened here where you have two foreign companies. Well, and we've also got a subsidiary. That's another issue, Your Honor. Well, to me, that's a very important distinction. The company, the defendant here is Italian? Swiss, Your Honor. Swiss. It was a sub that handled the deal here. That's correct. And so to address the point that you raised, Judge Duncan, there is a contact, but that's not enough. The contact has to relate to the claim. And if you look at the claim that Conte came into court with, it was limited to enforcement of the award under the New York Convention. Well, the underlying dispute, though, had to do with the breach of the time charter, right? That's correct, Your Honor. Why was the time charter breached? It was breached because the ship blew up. And why did the ship blow up? Well, if we go that way, we can go all the way back to the Stone Age if you keep moving. No, we don't need to go back to the Stone Age. We need to go back to New Orleans, right? But if you look at that, I'm being a little facetious, but if you look carefully at when the breach occurred, was it the acceptance of the goods? Well, that happens in Antwerp, Belgium, where there's a dangerous goods screening center. There wasn't a finding by the arbitration panel about why the time charter was violated? I'm afraid not, no. No? There's no specific moment that they fixed. It wasn't necessary for them to say. The Second Circuit says that MSC should have known that this was dangerous cargo and should have looked for certain instructions that were contained in some other document, right? Something like that? No, Your Honor. The Second Circuit found that MSC did not act negligently and that they could not have reasonably known about the risks presented by this cargo, meaning the degree of the danger. So, okay. Why is there a $200 million arbitration award then for violation of the time charter? MSC conceded that it breached the charter party because the DVB, as it turned out, that's the name of the chemical, divinyl benzene, because it exploded, it therefore was no longer properly shipped cargo under the IMDG code. It's strict liability. Right, but didn't it explode because of the temperature that it was stored at? A number of factors. The amount of oxygen, the temperature, primarily the temperature, Your Honor. Okay, and the temperature, if you walk outside this courthouse, it's really hot, right? It certainly is. It was stored here in New Orleans. The temperature was too high. Isn't that right? In addition, though, it then spent another 10 days sailing around the Gulf before heading across the Atlantic. So, you know, I would argue that the real breach is either where the explosion occurred, which is mid-Atlantic, or in the, as Judge Jones suggested, the failure to properly scrutinize the cargo earlier in. I guess what I'm getting at is if personal jurisdiction depends on there being no contact related to the underlying dispute, we have New Orleans here, and it is related to the underlying dispute. It's not related to the arbitration award, which is London, but it is related to the underlying dispute. So Judge Jones brought up the fact that there's a subsidiary here. Is that a more sound basis for saying there's no minimum contact here? Well, certainly. I argued, and I think it's correct, that MSC, the Swiss company, certainly has no contacts with this forum. All the actions taken with respect to the carriage of these goods were done by its U.S. subsidiary. And that alone, I think, is enough basis to find that there's no valid assertion of specific jurisdiction. I want to point out one quick thing, too, which is, you know, ultimately personal jurisdiction is about fair play, traditional notions of justice. And look at this situation. This is not a tort claim that we're dealing with. Conte was in privity of contract with MSC. They signed a long-term charter party, 16 years. And, in fact, the vessel was constructed solely for the purpose of MSC to charter it and then employ it in its trade. And a key term of that contract was that all disputes would be resolved in English arbitration, with English law to apply. So I would say there was no one in Conte or MSC's side ever conceived that they would be subject to litigation in New Orleans concerning the charter party. So I don't think that there really is enough of a relation between the loading of the container in New Orleans and the underlying dispute. Okay. You have a chance for rebuttal. Sure. Thank you. Thank you. Okay. Mr. Stratt? Yes, Your Honor. Good morning. Arthur Kratz on behalf of the appellee, Conte. I think that's how we've shortened it. Why is there always a dot after the 11? Your Honor, I wish I knew the answer to that question. I don't know. It's not a typo. I just keep seeing that and thinking it's a typo, but it's not. It's not a typo. Unfortunately, I don't know the answer to that question, but I would like to answer some of the questions that you asked my colleague, because I think Your Honor specifically hit on some pretty important points. You asked my colleague what his best circuit case was that says you can't look through the application to confirm for purposes of personal jurisdiction. The direct answer to your question is there is none. We cited four circuit cases in our brief. There's the Tenth Circuit case, whose name I have difficulty pronouncing. There's also the Second Circuit case in Seoul Resort. We cited a case from the Ninth Circuit and another one from the Third, all of which said that it was appropriate for a district court to look through the application to confirm to the underlying dispute for the purposes of establishing personal jurisdiction. So I think that answers your question. There was also some discussion about what connection this case has to New Orleans and why this case is here, and I want to address that directly. The reason that this case is here in New Orleans is because MSC, the Swiss Geneva entity, was the time charter of this vessel. Now, what that meant was that MSC had the right to dictate where the vessel would go, what ports it would go to, what cargo would be placed on board. It was MSC that directed the vessel to the port of New Orleans. Once the vessel arrived at the port of New Orleans, just down the street from here, it was MSC who ordered the vessel to take— It was the American sub of this appellant. So two points on that, Your Honor. First of all, the parent subsidiary argument was raised for the first time in the appellant's reply brief on appeal. That argument was not presented to the district court, nor was it presented in its principal brief. But I still want to respond to it because I think what was pled in the district court— And I think when we're asking what the facts are here, the facts that are binding between these two parties for purposes of this appeal are the findings of the London arbitration panel. And those are in the record. They were attached to our opposition to the motion to dismiss for lack of personal jurisdiction. What the London arbitration panel found was that MSC directed the vessel to New Orleans, which makes sense because it was the Geneva entity that was the time charter. And once here, it acted through an agent. And I think it's improper to characterize the MSC-USA subsidiary as an independent subsidiary. The MSC-USA— Subsidiaries are subsidiaries under corporate law, period. Now, it is—I would suggest that the time charter probably made them an agent or something like that. But, of course, if it's not before us, it's not before us. The other thing that makes them an agent, Your Honor, and if this argument had been raised below, we would have developed a record on it, there's an agency agreement between MSC-Geneva and MSC-USA that appoints MSC-USA as MSC-Geneva's general agent for all purposes. Now, the reason why that's not in the record and that's not developed is because this subsidiary argument was not raised until the appellant's reply brief on appeal. But since the court raised it, I did want to address it. I think there's a general agency relationship there. But setting aside the parent subsidiary for a moment, what happened when the vessel got here was three containers of explosive cargo were placed on board my client's vessel. Now, I don't by any stretch of the imagination want to imply intent here, but essentially what happened is three explosive devices were placed on my client's vessel in New Orleans. A couple weeks later over the North Atlantic, the vessel exploded. I think it's uncontroversial that if there was no arbitration clause, my client could have sued MSC in New Orleans for breach of the charter party for placing three explosive devices on its vessel in New Orleans. And again, I don't want to imply intent. There's absolutely no suggestion that — Where do we look for findings about why the time charter was breached? We look to the London arbitration panel's reasons for judgment, which were attached to my client's opposition. And it specifically says in there that MSC breached the time charter when it allowed the containers to be loaded on board the vessel in New Orleans without adequate warning to Conti, to the vessel owner. And the reason for that is because had Conti been told, had the vessel owner been told about the nature of these containers, it would have done something different. And everything I'm telling you I pulled from the London arbitration award. First, it would have required that the cargo be shipped in refrigerated containers. We know — I mean, that's all totally immaterial because we are here on a $220 million arbitration award, right? That's right, Your Honor. And you're saying that you're trying to enforce that the way you would enforce a judgment. Now, of course, if you had gone to the court in London, you would have won or you've won so far. You're just wasting our time, aren't you? I want to respond to that directly. It was on my notes to respond to, so I'm glad you brought it up, Your Honor. Well, I'm glad I did. I think delay is a serious issue here, but I would respectfully suggest that perhaps we're asking the wrong party about why there's been a delay. The reality is over two years ago, a London arbitration panel — I'm not talking about delay. I'm talking about two parties, neither of which is housed in the United States. They execute their agreement, charter party, outside the United States. Of course it pertains to vessels that go all over the world. Problems exist. They say we're arbitrating in London under English law. So it seems natural that one would enforce the consequences of the arbitration in England under English law. But no, you come to the U.S. And I can tell you why, Your Honor. Well, that's what I'm asking. Because MSC refused to pay the arbitration award. And in my client's view, MSC has embarked on — There was a bunch of other litigation pending, right? Second Circuit limitation proceeding. And then, of course, they had the right under English law to go back to the high court. So, Your Honor, their right to limit has obviously been denied by two levels of courts in England. I understand that. I'm not — There's actually a defense for this. What Your Honor is discussing, the convention, the New York convention under which our lawsuit was brought, allows a defendant to assert several Article V defenses. One of the Article V defenses that a defendant could assert, if they chose to do so, was that the award is not yet ripe for payment under the law in which the award was issued or under the law in which the — which governed the result in the arbitration. MSC did not press that defense before the trial court. MSC could have here. They could have. And I would have to go back and double-check, but I'm relatively certain — Because they were arguing jurisdiction. If you're arguing jurisdiction, you don't get the merits. Ah, but, Your Honor, so the procedure here was first MSC filed its motion to dismiss for lack of subject matter jurisdiction. That was denied. MSC requested an immediate appeal of that issue, which was denied. And then we filed a motion to confirm the arbitration award, which MSC opposed. In opposing that motion on the merits, they did not raise the Article V defense that I just told you about. That would have been their opportunity to do so. I think — I would have to go back and double-check on the record. I think they may have even pled that Article V defense in their answer, but then ultimately didn't press it on the merits. And so, Your Honor, the concerns that you're raising are actually baked into the convention. The New York Convention thought about those concerns, and those defenses are available. That MSC chose not to assert them here is not a reason to — Well, because principally they asserted subject matter jurisdiction. Then they asserted personal jurisdiction. Now, we're not here on the merits, right? I mean, well, we are, only if we reject personal jurisdiction. I have appealed — You ought to be — you ought to be happy about that. But the point is, what does that have to do with personal jurisdiction? The question I'm asking is, why is Conte trying to enforce in a U.S. court and not through the English system? Two reasons, Your Honor. One, they're trying to get paid. And number two, MSC has assets here in New Orleans that can be seized. That's the reason why MSC's insurer issued an LOU to stop us from seizing their assets. The reason that we have a — Do they have 220 million of assets here? I don't know the precise value. MSC is the majority owner of the New Orleans container terminal. And MSC has a — I couldn't tell you the exact number — a large number of container shells sitting on that terminal that we could have attached. And to be frank, that was a course of action that we considered when they objected to personal jurisdiction. We ultimately didn't do that because MSC's insurer stepped in and offered us the LOU, which is better security. So we took that. But the reason why it's here is because my client's trying to get paid the $220 million that an arbitration panel ordered MSC to pay over two years ago. And respectfully, what's been happening in New York and what's been happening in London is part of a campaign by MSC to just not pay what they indisputably owe us. And that's partly because the maker or transporter of the DVB snuck at them, right? Well, Your Honor — That's been found by the Second Circuit, has it not? Respectfully, with what the Second Circuit found, whether some other third party has an obligation to indemnify MSC is irrelevant, is legally irrelevant to whether MSC has an obligation to pay my clients under the arbitration award. No. Okay, yes and no. In terms of — In a multiparty dispute like this, you end up with all sorts of consequences, so whatever. And we would respectfully suggest, Your Honor, that one of the consequences is when your client has been — when a party has been cast in judgment like MSC has, they need to pay that judgment. And if they have recourse against others, then they need to pursue that. Is it accurate to say that you were not really defending the basis on which the district court ruled? Because the first point in your Apple e-brief is that specific jurisdiction arises here out of the Ford case. I would disagree. I would say no, that's not correct. The district court actually cited Ford and then applied Ford in reaching its decision. I think — and I'm glad that we've transitioned because I really would like to talk about the look-through doctrine. So I don't think that Vaden or Bajoreau have anything to do with this case for five reasons that we outlined in our brief. I don't know if I'm going to be able to get through all of them in the time that I have. Vaden and Bajoreau are about subject matter jurisdiction. Subject matter jurisdiction, as this Court is intimately familiar with, is fundamentally a creature of statute, at least with respect to federal jurisdiction. So Vaden and Bajoreau are fundamentally about statutory interpretation. How do we interpret Chapter 1 of the FAA? The problem with importing those principles to this case in the context of specific jurisdiction is that this case is neither — this appeal is neither about subject matter jurisdiction nor is it about Chapter 1 of the FAA. This is about personal jurisdiction under Chapter 2 of the FAA. And personal jurisdiction as — in fact, Your Honor, Judge Jones, you wrote the en banc opinion in the Douglas case recently from the Fifth Circuit that talked about personal jurisdiction in a federal question case, which is the same as 14th Amendment analysis. We look for statutory authorization for service of process, and then we proceed to the constitutional analysis. Well, in Louisiana, statutory authorization comes from the Louisiana long-arm statute. That authorizes service of process to the full extent it's constitutional. So for personal jurisdiction purposes, we're done with statutory interpretation. But yet what MSC has argued on appeal is that, no, we're not finished. We have to engage in a second set of statutory interpretation. Well, that's partly — well, no, the district court accepted that the FAA Section 2, he said, only deals with — only deals with subject matter, but will say it deals with venue, too, also. I think — I think what the district court said — And you're walking away from that. I'm not — I think I just disagree with MSC as to what exactly the district court's analysis did, although ultimately on that point, I'll note that this court reviews judgments. It doesn't review reasoning. And so I think, you know, this court ultimately reviews whether there's personal jurisdiction or not, not whether the district court's reasoning to get there was correct. But I don't think the district court held that it needed statutory authorization for the look-through. I think what the district court did is it analyzed MSC's argument that it needed statutory authorization, and it talked about all the reasons why Chapter 2 of the FAA, and all the reasons why personal jurisdiction is different than subject matter jurisdiction, and then ultimately said, if we need the statutory authorization, certainly the venue statute seems to imply that that's permissible. But what I'm telling this court is that what the district court did next was all it needed to do, which was to analyze personal jurisdiction, specific personal jurisdiction under the Ford case. And MSC on appeal doesn't seriously dispute that once you engage in that analysis, they dispute whether you should or not, right? But once you engage in the personal jurisdiction analysis considering the underlying context, underlying contacts, I'm sorry, MSC doesn't seriously dispute that personal jurisdiction exists. Actually, actually, I think they did. I made notes about this. They said Ford does not apply because, A, unlike the Ford case, Conte is not a Louisiana resident. B, the explosion and, therefore, the injury occurred somewhere in the Gulf of Mexico, not in Louisiana. There was no injury at the Port of New Orleans. And, C, therefore, there were no damages in Louisiana, and all of those are fundamentally different from the Ford case by the Supreme Court. So I will happily agree, Your Honor, that the facts of this case are very different from the facts in Ford. We don't cite Ford, though, for its facts. We cite Ford for the holding that the U.S. Supreme Court reached, and that was specifically that when analyzing specific personal jurisdiction, you look for contacts that arise out of or relate to the cause of action. Well, you're just completely doing away with arising out of, and you're doing away with all the limitations that the court had previously expressed, and the Ford case does not go that far. Admittedly, it's pregnant with ambiguity, but it certainly does not go that far, because if what you're saying is the case on these facts, then I was wrong in NKV in which the Supreme Court denied cert. I don't think the en banc court was wrong in that case. What I will say is let me pose a hypothetical for you. Let's say that a resident of some state on the East Coast, say Virginia, is driving through Louisiana. They have car trouble. They take their car to a mechanic to get fixed, and the mechanic, I'll confess to not being a car expert, so the facts of this may strain reality a little bit. The mechanic does some work on the car. Virginia resident gets back in the car, drives it out of Louisiana. Somewhere in Texas, because of something the mechanic has done wrong, the car explodes. That's the Supreme Court's, is it BMW case or GM or which one? There's one of those that denies specific jurisdiction in a tort context. I think that's Worldwide Volkswagen in Oklahoma, but what I'm talking about is in that situation where a Louisiana mechanic does something to a car and as a result of that work, the car explodes in Texas. I don't think anybody would seriously argue that there's not personal jurisdiction in Louisiana for the work the mechanic did on the car that made it explode. Those facts are not fundamentally different from the facts we have in this case, right? If you take out the parent subsidiary argument, MSC directed some explosive devices to be placed on Conti's vessel in New Orleans. That happened. You say volatile chemicals. I can say volatile chemicals. My point is that because of the way they were stored, they were explosive, and nobody intended for that to happen. Where was the time charter breached? The time charter was breached in New Orleans when the containers were put on the vessel. I think it's difficult to allege another place where it was breached. To say that it was breached over the North Atlantic— There's nothing—storing these particular chemicals, what is it, DVB? DVB. DVB. Is it a breach of the time charter to send DVB on the vessel? Yes. It was a breach— Categorically? No. No, I'm sorry. I misunderstood your question. No. The DVB could, as I understand it, could have been shipped on the vessel in a way that would not have breached the time charter. It would have had to have been stored in refrigerated containers, and it would have had to have been labeled in such a way that it was actually stored above. If it had been disclosed to the owners as explosive, they would have stored those containers above deck and forward instead of below deck and in the middle. By the way, of course, the stowage happened in New Orleans. One of the reasons why this incident was so catastrophic is because when these containers exploded, they were in the bottom of the vessel in the middle of it. So if it had been properly labeled, they would have been stowed differently. So where were the containers improperly stowed in New Orleans? Did the vessel sink? It did not sink. I will just say it did not sink. It was very, very seriously damaged. It was on fire for several days. It was eventually towed to a port in, I think, Germany. Don't quote me on that. Where eventually it was able to be offloaded. I just have a real hard time fitting this. Well, first of all, we're dealing with the award of the arbitration panel. We're not dealing with the explosion or a tort case. So it's a contract case between very sophisticated parties. And you're trying to enforce a judgment of a London arbitral panel. And the breach, if anything, occurred when the Swiss company fails to pay Conti, right? You mean the failure to satisfy the arbitration award? Correct. That's the contract breach. That's when the arbitration award was not satisfied. But, of course, we contend. And I guess the point here is that when the United States acceded to the New York Convention and when Congress passed Chapter 2 of the FAA, they did that in order to enable participants in foreign arbitrations. I mean, did they? Where does it say that? Well, Chapter 2 of the FAA. But isn't it curious that while Chapter 2 speaks specifically of venue, it doesn't say anything about jurisdiction. So the fact that it poses venue in the U.S. does not automatically solve personal jurisdiction. I agree with you, Your Honor. And the reason for that is because under decades of personal jurisdiction jurisprudence in the United States, the only statutory authorization you need for personal jurisdiction is the forum state's long-arm statute. Right. And you need to satisfy due process, which means contact. Agreed. And in the contract, yes. The last point I'll make is on the contacts. The four circuits that have considered that question have all answered it the same way. And so I respectfully suggest that this Court should not create a four-to-one circuit split. Thank you. All right. Mr. Werner, how do you respond to that last point? Well, I don't think that there will, in effect, be a circuit split, because if Badgero and Vaden are properly understood, I don't think the Tenth Circuit, for example, would reach the same result they did. So there would be a circuit split. You just think the Tenth Circuit's wrong? I think that the Tenth Circuit didn't consider the argument that MSU did. I mean, there would be a circuit split, right? There would be a four-to-one circuit split if we accepted your position that we can't look through. I think in the fullness of time, what I'm trying to say, Your Honor, in all seriousness, is I think the Supreme Court has resolved whatever split exists, because the decisions in Vaden and Badgero, the underlying fact that an arbitral award extinguishes the underlying substantive claim is the law of the land. The Supreme Court has reconfirmed it in Badgero. All the four circuits that have looked through, and I keep using that term, have looked at the underlying dispute that led to the arbitration award. Those are basically superseded? I would agree with that, Your Honor. That's the position that I'm advocating. Was the time charter violated in New Orleans? I don't believe it was, Your Honor. Where was it violated then? When the vessel exploded. When the cargo became no longer proper cargo under the IMTG Code, which is at the time that it reacted the way it did. To address the earlier question posed by the panel, DVB is permitted to be shipped, carried aboard vessels. That's why MSC accepted the provision. When is it not? When is it? When is shipping it? When would shipping it violate a time charter? The IMTG Code works on the system of a whitelist. If anything explodes, it automatically therefore becomes improper to ship under the IMTG Code. Anything that doesn't explode, as long as it's properly labeled, is proper to be carried. DVB at the time was not heavily regulated under the IMTG Code. There was a major oversight by the body, the United Nations, which prepares those classifications. It has since been reclassified, and now there are many different requirements that would have prevented this incident from occurring. So today, if it were being shipped, when would it be improperly shipped? If it is not in the proper type of container, and if it's not set to the right temperature, and if it's not properly labeled or placarded. But it would not be accepted by MSC at those earlier stages. That's why I talk about the acceptance happening in other places. If there was any error by MSC, it would have been in the processing of the documentation, which happens long before the cargo is brought to New Orleans. Now, just in my limited time, I want to say a few things about this case. I think it's important to note that MSC is not a scoff law. This is not the type of case where the plaintiff has to hunt the world to find assets to enforce this award against. MSC and its underwriters have been in constant communication with Conti and their underwriters. Everybody knew that MSC would ultimately pay once all its legal arguments had been exhausted in the U.K. And the other thing I want to point out is— Is there anywhere in the United—other than Eastern District of Louisiana where the arbitration award could be enforced in a federal court? Absolutely, in New York, where Conti and MSC are actively engaged in litigation together in a limitation proceeding. MSC subjected itself to personal jurisdiction by making a claim in that limitation proceeding. There's absolutely no reason why they couldn't have tried to enforce the award in New York, and we were baffled at the time when they chose New Orleans instead. Well, they're saying that they could do a Rule B attachment. They actually cannot. And, in fact, I was surprised to hear that argument because they pled only federal jurisdiction as the subject matter jurisdiction. They didn't plead—in their complaint, they didn't allege the admiralty jurisdiction. And they couldn't have because once the award was issued, they no longer had an admiralty claim. So why was the LOU issued by the insurer? The LOU was issued by the insurer to prevent them from taking efforts elsewhere in the world, which they were threatening to do at the time. For example, going to South Africa, which has a very different legal regime and allows for arrests of vessels under different circumstances. Now, the final point I want to make is just as a matter of public policy. Suppose that we accept that the original underlying claim still somehow attaches when you're seeking to enforce an award, and you're going to analyze specific jurisdiction based on context that relates to that underlying claim. What would you do in this circumstance? Suppose that there's an arbitral award where there's two different breaches of contracts. And one occurred in New Orleans, but another one occurred in Switzerland, let's say. When you're seeking to enforce that award, is it sufficient that the one breach that occurred in New Orleans, does that give enough—is that enough of a basis to find personal jurisdiction to enforce all of the awards issued in that arbitration proceeding? I think you're going to run into problems like that. I think what we need in a personal jurisdiction context, just like subject matter jurisdiction, is a bright-line test that's easy to apply, particularly because the whole point of the Federal Arbitration Act and the New York Convention is that courts are not supposed to have to delve into the merits. It's supposed to be a very limited review of certain issues and defenses. And it's not—look where we are now. It's been more than two years since Conti sought to enforce its award, and we're now talking about the merits at length of the underlying incidents. What was the basis for Conti to seek limitation in New York? Oh, the Limitation of Liability Act of 1851, which allows vessel owners to limit their liability to the value of— Well, I understand that, but it's an Italian company. The time chartered to a Swiss. Well, the Titanic case established that a foreign company, a foreign vessel owner, is entitled to invoke the Limitation of Liability Act in federal court. If you're wondering why they subjected themselves to the personal jurisdiction of the United States, I do not know. They actually, in fact, could have gotten out of the case. They were subject to cargo claims in New York prior to the limitation proceeding being filed. But under the terms and conditions of MSC's Seaway Bill, there was a covenant not to supervision, which is routinely enforced by many circuit courts, including the Second Circuit. They could have avoided all liability, stayed out of the case entirely, and not had to file a limitation proceeding. But they chose to try to, I guess, resolve all the claims in the New York limitation proceeding. Thank you, Your Honors. All right. Thank you.